UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAMES FREDRICK SANFORD,

        Plaintiff,                Case No. 2:12-cv-426

v.                                 Honorable Robert Holmes Bell

DANIEL H. HEYNS, et al.,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis* without immediate payment of an initial partial filing fee. On July 12, 2013, this Court ordered service of Plaintiff's complaint on Defendants Deputy Warden Thomas Mackie, Resident Unit Manager Robert Norton and Librarian Amanda Winnicki. On August 26, 2013, Defendants Mackie, Norton and Winnicki filed a motion for summary judgment (docket #14) on the ground that Plaintiff failed to exhaust his available administrative remedies. Plaintiff was given until December 27, 2013, to file a response, but has failed to do so. Upon review, I recommend that Defendants' motion for summary judgment based on Plaintiff's failure to exhaust his available administrative remedies be granted.

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The standard for

determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 127 S. Ct. 910, 919-21 (2007). A moving party without the burden of proof need show only that the opponent cannot sustain his burden at trial. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable

jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Plaintiff is currently on parole. However, at the time of the events set forth in his complaint, he was incarcerated at the Chippewa Correctional Facility (URF). In his *pro se* complaint, he sued the Michigan Department of Corrections (MDOC), MDOC Director Daniel H. Heyns, Warden Jeffrey Woods, Deputy Warden Thomas Mackie, Resident Unit Manager Robert Norton, Librarian Amanda Winnicki, and Unknown Party #1 Health Unit Manager. Plaintiff alleges that on July 25, 2012, while he was incarcerated at URF, his roommate made several threats against him and told him that he would have him killed. Plaintiff knew that his roommate was in a gang, so he left the room and informed Officer Koben of the threats. Officer Koben told Plaintiff to return to his room and he would talk to Plaintiff's roommate. When Plaintiff's roommate returned to the cell after talking with Officer Koben, he told Plaintiff that he had better move or he would have him "fucked up." Plaintiff again reported the incident to Officer Koben. Plaintiff took all of his property out of the room and refused to return to the room because he was afraid for his life. Officer Koben told Plaintiff that Defendant Mackie was requiring him to write a misconduct on Plaintiff for disobeying a direct order. Plaintiff then went to the control center and the Lieutenant told Plaintiff to return to his cell, that he would be okay tonight, and that Plaintiff would be moved the next day. Plaintiff refused, stating that his roommate had threatened and assaulted him by pushing him into his wall locker.

On August 8, 2012, after being denied protection, Plaintiff was written another disobeying a direct order misconduct for refusing to return to the general population. Defendant Mackie stated that if Plaintiff continued to refuse orders to return to the general population, he would have his staff write misconduct tickets until Plaintiff became a Level V prisoner, and then he would transfer Plaintiff to another facility. On August 27, 2012, Plaintiff was written another misconduct ticket by Defendant Mackie, for a total of three for refusing to go to the general population. During his hearing on this misconduct, the Hearing Officer asked Plaintiff if he had ever requested protection. Plaintiff replied that he had requested protection on July 25, 2012. The Hearing Officer told Plaintiff that he should file a grievance on this matter.

On September 4, 2012, Plaintiff filed a grievance against Thomas Mackie for the denial of protective custody. On September 6, 2012, Plaintiff was given a hearing and was forced to return to the general population. Plaintiff was going to refuse, but Assistant Resident Unit Supervisor McLeod asked Plaintiff if he would try being housed on the westside, so Plaintiff agreed to try it. When Plaintiff's property was returned to him after the move, his television, which cost $142.50, had water in it, and his watch, which was worth $18.00, was gone. In addition, staff took two bags of coffee from Plaintiff at a cost of $3.31 each. Plaintiff asserts that staff began to harass him after his move.

Plaintiff subsequently filed a lawsuit and asserts that Defendant Winnicki was aware of this fact because she read all of his legal papers. Defendant Winnicki called Deputy Warden Horton and had Plaintiff moved back to the eastside on October 2, 2012. Plaintiff was placed in a room with a "young kid," who told Plaintiff that he was in a gang and that he could not deal with a roommate who had a breathing machine because it would keep him up at night. Plaintiff immediately informed staff and was told by Officer Sanford to go in the room and "kick his ass."

Plaintiff responded that he was not trying to stay in prison and Sanford said, "You know what the saying is, 'Fuck or Fight.'" Plaintiff stated that he was not "going out like that" and requested protection. On October 3, 2012, Plaintiff's request was denied by Defendant Mackie and he received a fourth misconduct ticket for disobeying a direct order for refusing to go to the general population. Plaintiff then filed a grievance on Defendant Mackie for refusing to provide Plaintiff with protection.

On October 15, 2012, Plaintiff received another misconduct ticket for disobeying a direct order that was directed by Defendant Mackie. Defendant Norton refused to send Plaintiff's legal mail to the federal court, stating that he was sick of Plaintiff filing grievances and lawsuits. When Plaintiff told Defendant Norton that there was no charge listed on the misconduct report, Defendant Norton stated that he was going to have Plaintiff sent to level IV. Later that day, Resident Unit Officer Hazett came to Plaintiff's cell and told him that Defendant Norton wanted him moved because he was sick of looking at Plaintiff's face. Plaintiff was then moved from Quarry Unit, which is for prisoners with medical needs like Plaintiff, to Steamboat Unit, which does not have 24 hour power. Plaintiff states that he requires 24 hour power for his CPAP machine. Plaintiff states that staff went through all his property and destroyed several of Plaintiff's legal papers by putting cocoa butter cream all over them. Plaintiff requested the remainder of his legal property, but Officer Peterson refused his request, stating that he was following instructions from Defendant Norton. Plaintiff was also placed on paper restriction.

On October 17, 2012, Plaintiff requested paper from Defendant McLeod, stating that he wanted to file a lawsuit. Officer Peterson subsequently came and got Plaintiff and took him to his property. Plaintiff gave Officer Peterson the property he wished to take to his cell, and Officer Peterson told Plaintiff that pursuant to the instructions of Defendant Norton, he would have to go through everything before Plaintiff could have it in his cell. Plaintiff then watched while Officer

5

Peterson and Defendant Norton took several legal papers from his property prior to giving them to Plaintiff at his cell. Plaintiff claims that for a period of time after he moved to Steamboat Unit, staff ran two extension cords into his cell to power his CPAP machine, but that they no longer do so because of fire safety issues. Plaintiff is now forced to stay up all night so that he will have power to sleep during the day.

Plaintiff claims that he is indigent and is entitled to 10 free first class letters each month. The accounting department keeps putting non-sufficient funds on Plaintiff's mail, so the mail room opens it and reads it. Plaintiff sent 10 letters out on August 13, 2012, and never got them back. Plaintiff states that no one knows what happened to the mail and he believes that staff are purposely interfering with Plaintiff's mail so that it will not get out.

On July 12, 2013, the court dismissed Plaintiff's claims against Defendants Heyns, Woods, Unknown Party #1, and the Michigan Department of Corrections. In addition, the court concluded that Plaintiff's First and Eighth Amendment claims against Defendants Mackie, Norton, and Winnicki were not clearly frivolous and could not be dismissed on initial screening.

Defendants claim that they are entitled to summary judgment because Plaintiff failed to exhaust his available administrative remedies. Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies,

prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007); *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 127 S. Ct. at 922-23.

MDOC Policy Directive 03.02.130 (effective July 9, 2007), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶ P. The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly. Information provided shall be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original). The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ X.

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due. *Id.* at ¶¶ T, DD. The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a medical care grievances. *Id.* at ¶ GG. If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III. *Id.* at ¶ FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response

7

was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ X. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall be completed within 120 calendar days unless an extension has been approved . . . ." *Id* at ¶ HH.

Defendants state that Plaintiff Sanford has filed fifty step III grievance appeals while incarcerated at URF. *See* Defendants' Exhibit B, Plaintiff's Step III Grievance Report. However, as noted by Defendants, all of these grievances were completed / resolved after Plaintiff filed the instant complaint on November 13, 2012. The Sixth Circuit has squarely held that a prisoner "may not exhaust administrative remedies during the pendency of the federal suit." *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999). The administrative process must be complete before the prisoner files an action in federal court. *Id.* Therefore, because Plaintiff did not complete the MDOC grievance process prior to filing his complaint in any grievance filed at URF, he did not exhaust his administrative remedies.

For the foregoing reasons, I recommend that Defendants' motion for summary judgment (docket #14) be granted and this case be dismissed in its entirety.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $455 appellate

filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

          /s/ Timothy P. Greeley
          TIMOTHY P. GREELEY
          UNITED STATES MAGISTRATE JUDGE

Dated: January 28, 2014

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).